**MARLER CLARK INC., PS**
William D. Marler (*pro hac vice* forthcoming)
180 Olympic Drive S.E.
Bainbridge Island, WA 98110
Telephone: (206) 346-1888
Email: bmarler@marlerclark.com

**FERRARA & GABLE, LLC**
Michael A. Ferrara, Jr., Esquire (PA Attorney ID 16035)
601 Longwood Avenue at State Highway 38
Cherry Hill, NJ 08002
Telephone: 856.779.9500
Facsimile: 856.282.4287
mferrara@ferraragable.com
mgable@ferraragable.com
jgable@ferraragable.com

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KATHLEEN BORDEN, | | **COMPLAINT** |
| | Plaintiff, | **AND JURY DEMAND** |
| vs. | | |
| METABOLIC MEALS, LLC, | | Case No.:  2:26-cv-02103 |
| | Defendant. | |

**COMES NOW** the Plaintiff Kathleen Borden, who, by and through her attorneys of record, Michael A. Ferrara, Jr., alleges upon information and belief as follows:

### I.    PARTIES

1.    The plaintiff Kathleen Borden ("Plaintiff") is a resident of Brandamore, Chester

COMPLAINT | 1

County, Pennsylvania.  The Plaintiff resides within the jurisdiction of this Court and is a Citizen of the State of Pennsylvania.

2.      Defendant Metabolic Meals, LLC ("Metabolic Meals"), is a limited liability company organized under the laws of the State of Missouri, with its principal place of business located at 464 Bussen Underground Rd., Saint Louis, MO 63129. Defendant Metabolic Meals is a Citizen of the State of Missouri.

## II.      JURISDICTION AND VENUE

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a) because the matter in controversy exceeds $75,000.00, exclusive of costs, it is between citizens of different states, and the Defendant has certain minimum contacts with the State of Pennsylvania such that maintenance of the suit in this district does not offend traditional notions of fair play and substantial justice.

4.      Venue in the United States District Court for the Eastern District of Pennsylvania is proper pursuant to 28 U.S.C. § 1391(a)(2) because a substantial part of the events or omissions giving rise to the Plaintiff's claims and causes of action occurred in this judicial district, and because the Defendant is subject to personal jurisdiction in this judicial district at the time of the commencement of the action.

## III.      GENERAL ALLEGATIONS

### *Salmonella* Bacteria

**A.  What is *Salmonella*?**

5.      In 1885, pioneering American veterinary scientist, Daniel E. Salmon, was credited with discovering the first strain of *Salmonella.* Actually, though, Theobald Smith, research assistant to Dr. Salmon, discovered the first strain of *Salmonella—Salmonella* Choleraesuis. But

being in charge, Dr. Salmon received all the credit.[1]

6. Today, the number of known serotypes of *Salmonella* bacteria totals over two thousand. And in recent years, concerns have been raised as strains of *Salmonella* have become resistant to traditional antibiotics.

7. There are two *Salmonella* species: *Salmonella enterica* (*S. enterica*) and *Salmonella bongori* (*S. bongori*). *S. bongori* strains predominantly colonize cold-blooded reptiles, whereas *S. enterica* strains can infect both humans and mammals.[2] Based on factors such as morphology, structure, mode of reproduction, and other criteria, the two species are further classified into subgroups called serotypes or serovars. More than 2,600 serotypes have been described for *Salmonella*, and they are characterized by the type(s) of animal they are found in or by the clinical symptoms they cause.[3] Of these, less than 100 are responsible for most human *Salmonella* infections.[4]



---

[1]    Kass EH. (1987). A brief perspective on the early history of American infectious disease epidemiology. *Yale J Biol Med*. 60(4):341-8.

[2]    Hernandez, A. K. C. *Salmonella bongori*. Poultry and Avian Diseases. *Encyclopedia of Agriculture and Food Systems*. https://www.sciencedirect.com/topics/agricultural-and-biological-sciences/salmonella-bongori.

[3]    Boore AL, *et al*. (2015). *Salmonella enterica* Infections in the United States and Assessment of Coefficients of Variation: A Novel Approach to Identify Epidemiologic Characteristics of Individual Serotypes, 1996–2011. *PloS One*. 10(12): e0145416

[4]    Besser JM. (2018). *Salmonella* epidemiology: a whirlwind of change. *Food Microbiol*. 71:55-9.

### B. Where Does *Salmonella* Come From?

8. *Salmonellae* are widely distributed in nature and are found in the intestinal tract of wild and domesticated animals and in humans. *Salmonella* poisoning can occur when a person ingests contaminated fecal particles transmitted by another infected human or animal.[5]

9. *Salmonella enterica* serotypes Typhi, Sendai, and Paratyphi A, B, or C are found exclusively in humans. These serotypes, collectively referred to as typhoidal *Salmonella*, cause enteric fever (also known as typhoid or paratyphoid fever if caused by serotypes Typhi or Paratyphi, respectively).[6] Most often, enteric fever is acquired through ingestion of food or water contaminated with human feces. Most U.S. residents who are diagnosed with typhoidal *Salmonella* are infected while traveling abroad in areas where typhoid fever and paratyphoid fever are common. Three types of vaccines against *S*. Typhi are commercially available, although there is still not a single licensed vaccine available against *S*. Paratyphi A.[7] Persons planning to travel outside of the United States are advised to find out if a vaccine for typhoid fever is recommended (*see* www.cdc.gov/travel).

10. Most *Salmonella* infections are caused by eating contaminated food. One study found that 87% of all confirmed cases of *Salmonella* are foodborne. Foods of animal origin, including meat, poultry, eggs, or dairy products can become contaminated with *Salmonella*. Eating uncooked or inadequately cooked food—or food cross contaminated with uncooked or undercooked products—can lead to human infections. As explained in a comprehensive report issued by the U.S. Department of Agriculture's Economic Research Service:

---

[5]    Chiu, C.-H. (2019). *Salmonella, Non-Typhoidal Species (S. Choleraesuis, S. Enteritidis, S. Hadar, S. Typhimurium)*. http://www.antimicrobe.org/b258.asp.

[6]    Ohad eGal-Mor, Erin C Boyle, & Guntram A. Grassl. (2014). Same species, different diseases: how and why typhoidal and non-typhoidal *Salmonella* enterica serovars differ. *Frontiers in Microbiology*, 5. https://doi.org/10.3389/fmicb.2014.00391

[7]    *Id.*

*Salmonella* contamination occurs in a wide range of animal and plant products. Poultry products and eggs are frequently contaminated with *S.* Enteritidis, while beef products are commonly contaminated with *S.* Typhimurium. Other food sources of *Salmonella* may include raw milk or other dairy products and pork.

11.     In the past two decades, consumption of produce, especially sprouts, tomatoes, fruits, leafy greens, nuts, and nut butters, has been associated with *Salmonella* illnesses.[8] The surface of fruits and vegetables may be contaminated by human or animal feces. Changes in food consumption and production, as well as the rapid growth of international trade in agricultural products, have facilitated the transmission of *Salmonella* associated with fresh fruits and vegetables.

12.     In the United States, *Salmonella* is the second most isolated bacterial pathogen when laboratory diagnosis of diarrhea is sought.[9] However, passive laboratory surveillance, which uses voluntary reporting by health care providers and facilities, captures only a fraction of illnesses that occur. Furthermore, only a small proportion of illnesses are confirmed by laboratory testing and reported to public health agencies. Thus, researchers rely on quantitative statistical modeling to estimate the incidence of foodborne illness. These estimates are used to direct policy and interventions.

C.  **What are the Symptoms of Salmonellosis?**

13.     *Salmonella* infections can produce a broad range of disease, from no symptoms to severe illness. The most common clinical presentation is acute gastroenteritis. Symptoms commonly include diarrhea and abdominal cramps, often accompanied by fever of 100°F to 102°F (38°C to 39°C). More serious infections may also involve bloody diarrhea, vomiting,

---

[8]     National Typhoid and Paratyphoid Fever Surveillance Annual Summary, 2015." Centers for Disease Control and Prevention, 6 Nov. 2018. Available at: https://www.cdc.gov/typhoid-fever/reports/annual-report-2015.html.

[9]     "National Enteric Disease Surveillance: *Salmonella* Annual Report, 2016." Centers for Disease Control and Prevention, 28 Feb. 2018. Available at: https://www.cdc.gov/nationalsurveillance/pdfs/2016-Salmonella-report-508.pdf.

headache, and body aches.[10]

14.    The incubation period, or the time from ingestion of the bacteria until the symptoms start, is generally 6 to 72 hours; however, there is evidence that in some situations the incubation can be longer than 10 days. People with salmonellosis usually recover without treatment within three to seven days. Nonetheless, *Salmonella* bacteria can persist in the intestinal tract and stool for many weeks after the resolution of symptoms—on average, one month in adults and longer in children.[11]

### D.  Treatment of Salmonellosis

15.    *S.* Typhi and *S.* Paratyphi can cause systemic illness if they invade the bloodstream (termed "bacteremia"). "Septicemia" or "sepsis" (bloodstream infection or "blood poisoning") occurs if the bacteria multiply in the blood and cause the immune system to respond by activating inflammatory mechanisms. This may result in the development of "systemic inflammatory response syndrome," or "SIRS," which is defined by the combination of tachycardia, tachypnea, fever, and abnormal white blood cell count. When the bacteria involved are *S.* Typhi or *S.* Paratyphi, this serious illness is called enteric typhoid, or paratyphoid fever. Symptoms may start gradually and include fever, headache, malaise, lethargy, and abdominal pain. In children, it can present seemingly innocuously as a non-specific fever. The incubation period for *S.* Typhi is usually 8 to 14 days, but it can range from three to 60 days. For *S.* Paratyphi infections, the incubation period is like that of nontyphoidal *Salmonella*—one to 10 days.[12]

16.    Medical treatment is acutely important, though, if the patient becomes severely

---

[10]    "*Salmonella*." Centers for Disease Control and Prevention, 24 Jun. 2020. Available at: https://www.cdc.gov/salmonella/.

[11]    *Id.*

[12]    Miller, S. and Pegues, D. "*Salmonella* Species, Including *Salmonella* Typhi" in Mandell, Douglas, and Bennett's Principles and Practice of Infectious Diseases, Sixth Edition, Chap. 220, pp. 2636-50 (2005).

dehydrated or if the infection spreads from the intestines. Persons with severe diarrhea often require re-hydration, usually with intravenous (IV) fluids. But antibiotics are not necessary or indicated unless the infection spreads from the intestines, at which time the infection can be treated with ampicillin, gentamicin, trimethoprim/sulfamethoxazole, or ciprofloxacin. Unfortunately, though, some *Salmonella* bacteria have become resistant to antibiotics, largely because of using them to promote the growth of feed animals.[13]

**Medical Complications of Salmonellosis**

### E.  Reactive Arthritis

17.    Formerly referred to as Reiter Syndrome, the term reactive arthritis refers to an inflammation of one or more joints, following an infection localized at a site distant from the affected joints. The predominant site of the infection is the gastrointestinal tract. And reactive arthritis can be post infection, meaning that the infection may not be active when diagnosed. Several bacteria, including *Salmonella*, can cause reactive arthritis.[14]  And although the resulting joint pain and inflammation can resolve completely over time, permanent joint damage can occur.[15]

18.    The symptoms of reactive arthritis include pain and swelling in the knees, ankles, feet, and heels. Less frequently, the upper extremities may be affected, including the wrists, elbows, and fingers. Tendonitis (inflammation of the tendons) or enthesitis (inflammation where tendons attach to the bone) can occur. Other symptoms may include prostatitis, cervicitis, urethritis (inflammation of the prostate gland, cervix, or urethra), conjunctivitis (inflammation of the membrane lining the eyelid), or uveitis (inflammation of the inner eye). Ulcers and skin

---

[13]    Medalla, F., Gu, W., Mahon, B. E., Judd, M., Folster, J., Griffin, P. M., & Hoekstra, R. M. (2016). Estimated Incidence of Antimicrobial Drug-Resistant Nontyphoidal Salmonella Infections, United States, 2004-2012. *Emerging infectious diseases*, *23*(1), 29–37. https://doi.org/10.3201/eid2301.160771
[14]    *See* "Reactive Arthritis." *Questions and Answers About.* N.p., n.d. Web. 12 Nov. 2015.
[15]    *Id.*

rashes are less common. Symptoms can range from mild to severe and can occur anywhere from three days to six weeks after the antecedent infection and may involve one or more joints, though usually six or fewer. Although most cases recover within a few months, some continue to experience complications for years. Treatment focuses on relieving the symptoms.[16]

### F.  Irritable Bowel Syndrome

19.     Irritable bowel syndrome (IBS) is a functional disorder of the gastrointestinal tract. The hallmark symptoms of IBS are abdominal pain and altered bowel habits, ranging from constipation to diarrhea, or alternating diarrhea and constipation. Abdominal pain is usually crampy in nature, but character and sites can vary. In some patients, the pain is relieved by defecation but, in others, defecation may worsen the pain. Additional symptoms may include bloating, straining at stools, and a sense of incomplete evacuation.

20.     The observation that the onset of IBS symptoms can be precipitated by gastrointestinal infection dates to the 1950s. Mechanisms are not known but include changes in the microbiome, use of antibiotics to treat the infection, and an increase in enteroendocrine cells.

21.     Another consequence of infective gastroenteritis is the disruption of normal gut flora. Studies on postinfectious IBS have provided etiological insights into the pathogenesis of IBS. It is well documented that following infective gastroenteritis, more than 10% of affected individuals go on to develop postinfectious IBS.[17] The risk of postinfectious IBS appears greater with bacterial gastroenteritis compared to viral gastroenteritis.

### Outbreak and Infection

### G.  2025 *Salmonella* Outbreak Linked to Metabolic Meals

---

[16]     "Reactive Arthritis." National Institute of Arthritis and Musculoskeletal and Skin Diseases, Oct. 2016. Available at: https://www.niams.nih.gov/health-topics/reactive-arthritis.

[17]     Ng, Q. X., Soh, A., Loke, W., Lim, D. Y., & Yeo, W. S. (2018). The role of inflammation in irritable bowel syndrome (IBS). *Journal of inflammation research*, *11*, 345–349. https://doi.org/10.2147/JIR.S174982

22.     The Centers for Disease Control and Prevention (CDC) and state partners investigated a multistate outbreak of *Salmonella* infections linked to Metabolic Meals home delivery meals. CDC opened this multi-state cluster investigation under ID 2508MLJEG-5.



23.     On November 21, 2025, the CDC reported a total of 21 cases of *Salmonella* from 13 states (AR (1), CA (3), CT (1), GA (2), IL (2), MN (3), MO (3), MS (1), NY (1), PA (1), TX (1), WA (1) and WI (1)). Illness onsets ranged from July 24, 2025, to October 3, 2025. Of 19 cases with information available, eight were hospitalized, and no deaths were reported. Cases ranged from 0 to 96 years (median 56). Sixty-two percent of cases were female. Whole genome sequencing analysis (WGS) showed that *Salmonella* from case samples were closely related genetically. This suggests that people in the outbreak fell ill from the same food.



24.    The Minnesota Department of Health (MDH) conducted its own outbreak investigation and defined a case as a person who had a *S.* Enteritidis infection with an isolate that was closely related (within 0 to 1 alleles) to the outbreak strain by WGS cgMLST, with illness onset from July 24 to September 26, 2025. Three Minnesota cases were identified as a part of this outbreak. Illness onset dates ranged from August 7 to September 26, 2025. All MN cases reporting ordering food from Metabolic Meals and provided purchase records back to the end of

June or beginning of July 2025. All three cases had deliveries during the week of July 28, 2025.

25.     State and local public health officials interviewed people about the food they ate in the week before they got sick. Of the 15 people interviewed, 13 (87%) reported eating a Metabolic Meals prepared menu item. This suggested that people in this outbreak got sick from eating certain Metabolic Meals prepared menu items. Six cases provided purchase records. All had orders that included meals delivered during the week of July 28, 2025. One of these meals, the Low Carb Teriyaki Chicken and Vegetables (lot code 25202, Best By: 08/05/2025), was purchased by all six cases. Three additional meals, the Four Cheese Tortellini with Pesto Sauce and Grilled Chicken (lot code 25199, Best By: 08/07/2025), the Black Garlic & Ranch Chicken Tenders with Roasted Vegetables (lot code 25205, Best By: 08/08/2025), and the Sliced Top Sirloin with Roasted Peanut Sauce and Summer Vegetables (lot code 25203, Best By: 08/06/2025), were purchased by five of six cases.

26.     These menu items, along with an additional meal delivered during the week of July 28 through August 3, 2025, with lot code 25204, were recalled by the firm on September 5, 2025. Additional meal lot codes included: 25199, 25202, 25203, 25204, 25205.

27.     Reportedly, Metabolic Meals sent an email to customers who received the implicated meals on September 5, 2025, alerting them to the outbreak and instructing them not to consume implicated meals. Plaintiff does not recall receiving such an email from the Defendant.

28.     Ultimately, this outbreak was closed as a multi-state foodborne outbreak of *Salmonella* Enteritidis infections associated with Metabolic Meals delivered the week of July 28, 2025. Neither a specific vehicle nor source of contamination were identified.[18]

### H.  Inspections of Defendant's Facility Showed Numerous Violations

29.     Defendant Metabolic Meals is regulated by the St. Louis County Department of

---

[18]     Investigation Update: Salmonella Outbreak, September 2025 | Salmonella Infection | CDC

Public Health in Missouri, which conducts inspections of the Defendant.[19]

30.      Inspection report of Defendant's facility from August 29, 2025, showed that the inspectors observed a cook handling raw chicken, changing gloves, and not washing their hands. They also observed items interfering with access to the hand sink, as well as a hose in the hand sink. Additional observations included bowls sitting face down on dirty food contact services, soil build up on food contact surfaces and equipment, improper cooling of cooked foods, soil buildup and food in non-food contact areas, and ice buildup in the walk-in freezer (indicative of insufficient cleaning).

31.      Inspection reports from August 4, 2025 and July 25, 2025 showed critical violations, specifically the lack of a proof of Hepatitis A immunization for all employees.

32.      Inspection report from April 24, 2025 showed a repeat violation of inadequate cleaning of certain surfaces and physical facilities.

## I.   Plaintiff's Injuries

33.      Ms. Borden purchased pre-prepared meals from the Defendant on June 12, 2025; June 19, 2025; June 26, 2025; July 3, 2025; and July 10, 2025.

34.      She subsequently consumed Defendant's pre-prepared meals. The meals were contaminated with *Salmonella enterica*.

35.      Ms. Borden experienced the onset of unpleasant gastrointestinal and systemic symptoms on August 19, 2025, consisting of nausea, vomiting, diarrhea, stomach cramping, fevers up to 102ºF, muscle aches and joint pain, and headaches.

36.      On August 22, 2025, Ms. Borden arrived at Chester County Hospital due to abdominal pain, diarrhea, and vomiting she had been experiencing over the prior three days. She

---

[19]      Inspection reports can be accessed here: St. Louis Department of Public Health – Inspections of Metabolic Meals (2025)

was evaluated by the emergency department and treated with intravenous fluids and supportive care.

37.    On August 29, 2025, Ms. Borden's stool sample tested positive for *Salmonella species* by GI PCR Panel.

38.    That same day, on August 29, 2025, Ms. Borden was admitted to Chester County Hospital, where she was hospitalized until August 31, 2025.

39.    As of October 6, 2025, Ms. Borden continued to test positive for *Salmonella* and experience weight loss and gastrointestinal symptoms.

40.    Ms. Borden's initial stool specimen further tested positive for *Salmonella* serotype Enteritidis (WGS IDs: PNUSAS546771 allele code: SALM1.1-6.6.6.6x.8x.307864). Ms. Borden was ultimately linked to the outbreak 2508MLJEG-5 by laboratory evidence in Pennsylvania Department of Health records, which was associated with Defendant Metabolic Meals.

41.    In the National Center for Biotechnology Information, Ms. Borden is directly linked to a cluster of cases of *Salmonella Enteritidis*, including cases from the Minnesota investigation. Her sample is colored red in the below phylogenetic tree:

## IV.    CAUSES OF ACTION

### COUNT I
### STRICT LIABILITY

42.    Plaintiff incorporates by reference and makes a part of this Count each and every foregoing paragraph of this Complaint.

43.    At all relevant times, the Defendant was the designer, manufacturer, distributor, and/or seller of the adulterated food product that is the subject of the action.

44.    The adulterated food product that the Defendant designed, prepared, manufactured, distributed, and/or sold was, at the time it left the Defendant's control, defective and unreasonably dangerous for its ordinary and expected use because it contained *Salmonella* bacteria.

45.    The adulterated food product that the Defendant designed, prepared, manufactured, distributed, and/or sold was delivered to the Plaintiff without any change in its defective condition. The adulterated food product that the Defendant designed, prepared, manufactured, distributed, and/or sold was used in the manner expected and intended, and was consumed by the Plaintiff.

46.    The Defendant owed a duty to the Plaintiff to design, prepare, manufacture, distribute, and/or sell only food that was not adulterated, was fit for human consumption, was reasonably safe in construction, and was free of pathogenic bacteria or other substances injurious to human health.  The Defendant breached this duty.

47.    The Defendant owed a duty of care to the Plaintiffs to design, prepare, manufacture, distribute, and/or sell food that was fit for human consumption, and that was safe to the extent contemplated by a reasonable consumer. The Defendant breached this duty.

48.     The Plaintiff suffered injury and damages as a direct and proximate result of the defective and unreasonably dangerous condition of the adulterated food product that the Defendant designed, prepared, manufactured, distributed, and/or sold.

## COUNT II
## BREACH OF WARRANTY

49.     Plaintiff incorporates by reference and makes a part of this Count each and every foregoing paragraph of this Complaint.

50.     The Defendant is liable to the Plaintiff for breaching express and implied warranties that it made regarding the adulterated food product that the Plaintiff purchased.  These express and implied warranties included the implied warranties of merchantability and/or fitness for a particular use. Specifically, the Defendant expressly warranted, through its sale of food to the public and by the statements and conduct of its employees and agents, that the food it prepared and sold was fit for human consumption and not otherwise adulterated or injurious to health.

51.     The Plaintiff alleges that the *Salmonella*-contaminated food that the Defendant sold to her would not pass without exception in the trade and was therefore in breach of the implied warranty of merchantability.

52.     The Plaintiff alleges that the *Salmonella*-contaminated food that the Defendant sold to her was not fit for the uses and purposes intended, i.e., human consumption, and that this product was therefore in breach of the implied warranty of fitness for its intended use.

53.     As a direct and proximate cause of the Defendant's breach of warranties, as set forth above, the Plaintiff sustained injuries and damages in an amount to be determined at trial.

**COUNT III**
**NEGLIGENCE**

54.    The Defendant owed to the Plaintiff a duty to use reasonable care in the design, preparation, manufacture, distribution, and/or sale of its food product, the breach of which duty would have prevented or eliminated the risk that the Defendant's food products would become contaminated with *Salmonella* or any other dangerous pathogen. The Defendant breached this duty.

55.    The Defendant had a duty to comply with all statutes, laws, regulations, or safety codes pertaining to the design, preparation, manufacture, distribution, storage, and/or sale of its food product, but failed to do so, and was therefore negligent. The Plaintiff is among the class of persons designed to be protected by these statutes, laws, regulations, safety codes or provision pertaining to the design, preparation, manufacture, distribution, storage, and/or sale of similar food products.

56.    The Defendant had a duty to properly supervise, train, and monitor its respective employees, and to ensure their compliance with all applicable statutes, laws, regulations, or safety codes pertaining to the design, preparation, manufacture, distribution, storage, and/or sale of similar food products, but it failed to do so, and was therefore negligent.

57.    The Defendant had a duty to use ingredients, supplies, and other constituent materials that were reasonably safe, wholesome, free of defects, and that otherwise complied with applicable federal, state, and local laws, ordinances and regulations, and that were clean, free from adulteration, and safe for human consumption, but it failed to do so and was therefore negligent.

58.    As a direct and proximate result of the Defendant's negligence, the Plaintiff sustained injuries and damages in an amount to be determined at trial.

## COUNT IV
## NEGLIGENCE PER SE

59.     Plaintiff incorporates by reference and makes a part of this Count each and every foregoing paragraph of this Complaint.

60.     The Defendant had a duty to comply with all statutory and regulatory provisions that pertained or applied to the design, preparation, manufacture, distribution, storage, labeling, and/or sale of the food products that injured Plaintiff,  including the applicable provisions of the Federal Food, Drug and Cosmetic Act, and similar Pennsylvania food and public health statutes, including without limitation the provisions of 3 Pa.C.S.A. Agriculture Ch. 57, all of which prohibit the manufacture and sale of any food that is adulterated, or otherwise injurious to health.

61.     The Defendant failed to comply with the provisions of the health and safety acts identified above, and, as a result, was negligent *per se* in its design, preparation, manufacture, distribution, and/or sale of food adulterated with *Salmonella*.

62.     The Plaintiff is in the class of persons intended to be protected by these statutes and regulations, and Plaintiff was injured as the direct and proximate result of the Defendant' violation of applicable federal, state, and local food safety regulations.

63.     As a direct and proximate result of conduct by the Defendant that was negligent *per se*, the Plaintiff sustained injury and damages in an amount to be determined at trial.

## V.     DAMAGES

64.     The Plaintiff has suffered general, special, incidental, and consequential damages as the direct and proximate result of the acts and omissions of the Defendant, in an amount that shall be fully proven at the time of trial. These damages include but are not limited to damages for general pain and suffering; damages for loss of enjoyment of life, both past and future; medical and medical related expenses, both past and future; emotional distress, past and future;

pharmaceutical expenses, past and future; and all other ordinary, incidental, or consequential damages that would or could be reasonably anticipated to arise under the circumstances.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff prays for judgment against the Defendant as follows:

A. Ordering compensation for all general, special, incidental, and consequential damages suffered by the plaintiff as a result of the defendant's conduct;

B. Awarding plaintiff her reasonable attorneys' fees and costs, to the fullest extent allowed by law; and

C. Granting all such additional and/or further relief as this Court deems just and equitable.

## JURY DEMAND

The Plaintiff hereby demands a jury trial.

BY:

*/s/ William D. Marler*
William D. Marler (*pro hac vice* forthcoming)
MARLER CLARK INC., PS
180 Olympic Drive S.E.
Bainbridge Island, WA 98110
Telephone: (206) 346-1888
Email: bmarler@marlerclark.com

*/s/ Michael A. Ferrara, Jr.*
Michael A. Ferrara, Jr. (PA Attorney ID 16035)
FERRARA & GABLE, LLC
601 Longwood Avenue at State Highway 38
Cherry Hill, NJ 08002
Telephone: 856.779.9500
Facsimile: 856.282.4287
mferrara@ferraragable.com

*Date:  March 31, 2026*              *Attorneys for Plaintiff*

COMPLAINT | 18